**UNITED STATES of America,**
**Appellee.**

v.

**Dominic BIONDO and Willie Francisco**
**Orlando, Appellants.**

**Nos. 73–1003 and 73–1004.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1973.

Decided Aug. 21, 1973.

Rehearing and Rehearing En Banc
Denied Sept. 27, 1973.

Irl B. Baris, Newmark & Baris, St. Louis, Mo., for appellants.

Peter M. Shannon, Jr., Dept. of Justice, Washington, D. C., for appellee.

Before Mr. Justice CLARK,* HEANEY, Circuit Judge, and SCHATZ, District Judge.**

SCHATZ, District Judge.

Appellants, Dominic Biondo and Willie Francisco Orlando, were convicted of conspiracy to extort money in violation of the Hobbs Act (18 U.S.C. § 1951). A two-count indictment had been returned in the United States District Court for the Eastern District of Missouri charging Biondo and Orlando and two co-defendants, Joseph Anthony Scalise and Anthony Michael Accardi, with having obstructed, delayed and affected interstate commerce (Count One) and having conspired to obstruct, delay and affect interstate commerce (Count Two) by demanding an extortion payment of $15,000 and accepting a partial extortion payment of $5,000 from one Joseph Wozniak who had entered into a business arrangement with Accardi in the operation of three fruit and produce markets within the St. Louis area. Thereafter, Biondo, Orlando and Scalise were tried by a jury and following dismissal of Count One at the close of the government's case in chief, Biondo and Orlando were convicted on Count Two and sentenced to five years imprisonment. Defendant Scalise was acquitted. The indictment of defendant Accardi, who had requested and was granted severance prior to trial, was subsequently dismissed.

The issues presented here are: (1) whether the evidence was sufficient to show that appellants conspired to obtain money by extortion in violation of the Hobbs Act, *supra*; (2) whether the trial court erred in permitting a fatal variance between the indictment and the evidence; (3) whether appellants' rights under the Jencks Act (18 U.S.C. § 3500) were violated; (4) whether admission of appellant Orlando's statement, given subsequent to his refusal to sign a waiver of rights form, was proper; (5) whether severance of co-defendant Accardi deprived appellants of their rights of due process under the Fifth Amendment, and their rights to compulsory process for witnesses under the Sixth Amendment; (6) whether the court erred concerning the admissibility of certain evidence; (7) whether the trial court erred in denying appellants' motion for a mistrial based upon a comment made by the prosecutor during his closing argument.

We affirm the judgments of conviction for reasons set forth hereafter.

Joseph Wozniak, age seventy, the victim of the purported conspiracy to extort money in violation of the Hobbs Act, had entered into a business arrangement with defendant Anthony Accardi whereby three fruit and produce markets were to be operated within the St. Louis area, namely, Tony's Colonial Market No. 1, Colonial Fruit Market No. 2, and the Woodson Market. Appellants Orlando and Biondo were employees at the markets. On May 18, 1971, Wozniak met with Orlando and Scalise and was informed that Biondo wanted a payment of $15,000 in cash from Wozniak, under threat of harm to his family and to his business interests. In this connection it was threatened that Biondo would run up bills at one of the markets, Colonial No. 2, for which Wozniak would be responsible. So far as the business arrangement is concerned between Wozniak and Accardi, the evidence shows that Colonial Market No. 1 was purchased by Accardi in September of 1970 with $20,000 advanced to him by Wozniak with no written agreement or contract. The Woodson Market was purchased by Wozniak in November of 1970 for $2,000 cash in order to expand Wozniak's and Accardi's fruit and vegetable business. On December 30, 1970, the Colonial Market No. 2 was pur-

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

** District Judge Albert G. Schatz, District of Nebraska, sitting by designation.

chased for $6,000, which sum was supplied by Wozniak. Wozniak signed the lease for Colonial No. 2 and paid an additional $1,450 as a security deposit and rent. Accardi managed the day-to-day operation of Colonial No. 2 and appellant Orlando managed Colonial No. 1 commencing in the fall of 1970. Scalise was one of Orlando's employees as was Biondo. Accardi, besides running the day-to-day operation of Colonial No. 2, also was in charge of Colonial No. 1, where Orlando was the manager. Wozniak visited Colonial No. 1 every day and made decisions, from time to time, as to the operation of this market. Wozniak participated in checking the inventory at the Woodson Market and took in the weekly receipts. At Colonial No. 2, Wozniak sometimes sold produce and at one time installed a lighting system in this market. In February of 1971, Wozniak was obliged to pay for bills which Accardi had failed to pay at Colonial No. 1 and at one time Wozniak was sued by the telephone company for an unpaid telephone bill at one of the markets, either Colonial No. 1 or Colonial No. 2.

Colonial Markets 1 and 2 sold the same products and the same type of produce, substantial quantities of the same having been brought into Missouri from Illinois and other states.

Following the May 18, 1971, meeting of Wozniak, Orlando and Scalise, Wozniak received a telephone call from Biondo, May 19, 1971, again threatening Wozniak's family if the money were not delivered that night. Meanwhile the evidence clearly shows that Orlando, who Wozniak thought was his friend and advisor, was urging Wozniak to pay Biondo the money in order to try to get Biondo on Wozniak's side, and Orlando assured Wozniak that Biondo would not require him to pay any more money if he would pay the $15,000.

Wozniak met with Orlando and Biondo on the evening of May 20, 1971, and stated that he could not raise the entire sum. On May 21, 1971, Wozniak received two telephone calls from Orlando

which were monitored by F.B.I. agents with Wozniak's permission (on May .18, 1971, following the initial demand of $15,000, Wozniak had reported the entire matter to the F.B.I.). In these conversations, Wozniak stated that he could raise only $5,000 that day and Orlando, after contacting Biondo, told Wozniak to bring the $5,000 to a designated parking lot at 3:30 p. m. and to get the rest of the money by the following Monday. As scheduled at 3:30 p. m., Wozniak met with appellants and handed Biondo an envelope containing $5,000. This meeting was monitored and observed by F. B.I. agents and appellants Biondo and Orlando were arrested at the parking lot immediately after Wozniak's payment.

We proceed to the issues which appellants have presented for review.

1) Appellants contend that the court erred in submitting the cause to the jury because the prosecution failed to make a submissible case against appellants for the reasons that there was no evidence that Wozniak had an ownership interest in the fruit stand, there was no evidence that Wozniak was fearful of the economic well-being of the fruit stand, and there was no evidence of an effect upon interstate commerce because there was no evidence the fruit stand was engaged in interstate commerce. We disagree. The evidence, which must be viewed in a light most favorable to the prevailing party, shows that Wozniak advanced the $20,000 to Accardi in order to buy a garbage disposal business. Instead, a fruit and produce stand known as Colonial No. 1 was purchased. Wozniak made frequent trips to the stand and participated in some of the operational decisions. The business was expanded by the purchase of two other markets including Colonial No. 2 which Wozniak paid for. He installed a lighting system and participated in the day-to-day operations of this store. He also advanced an additional $9,363 for Colonial No. 1 and paid some of the bills for both Colonial No. 1 and No. 2.

■ It is not necessary to precisely characterize Wozniak's relationship as

owner, partner, joint venturer, or guarantor because the evidence clearly shows that Wozniak had a definite financial interest in the business and was not a mere personal creditor. The Hobbs Act, *supra*, does not require the victim to be an "owner" of a business involved in interstate commerce. Rather, it seeks to prevent harm to interstate commerce. By directing their threats against Wozniak's financial interest in the business, appellants, in effect, threatened the entire business. Had the threats been carried out, the resources of the business would have depleted and diminished and interstate commerce would have been affected and obstructed. The law is well settled in this regard. See United States v. Amabile, 395 F.2d 47, 49 (7th Cir. 1968), vacated and remanded on other grounds sub nom, Giorando v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), where it was held that the depletion of an individual's personal assets in this context would amount to an obstruction of the business.

■ Further, Wozniak's family was threatened and we view these threats in the overall light in which they arose. When the threats to the economic well being of the business, that is, running up bills of $100,000 which Wozniak would have to pay, were combined with threats to the safety of Wozniak's family, the evidence clearly supports the conclusion that the threats were directed against the financial interest of Wozniak. A business may be threatened through the people who operate it and a threat toward the financial interest in a business is clearly harmful to that business and, consequently, is violative of the Hobbs Act. See United States v. Augello, 451 F.2d 1167 (2nd Cir. 1971), cert. denied, 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972).

■ Appellants also argue that there was no effect upon interstate commerce here because there was no proof that the fruit stand was engaged in interstate commerce, theorizing that there was but "slight evidence of some inter-

state merchandise coming to the premises" with which Wozniak was affiliated. Neither the evidence nor the law applicable thereto supports this contention. The evidence clearly shows that the produce stand in question bought substantial inventory from sellers in other states. It is not necessary that the total volume of sales of a business be broken down into what percentage relates to goods purchased from outside the state in question. See United States v. Augello, 451 F.2d at 1169–1170, and cases cited therein, and Stirone v. United States, 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960), wherein the Supreme Court said: "(The Hobbs) Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence. The Act outlaws such interference 'in any way or degree.'" (citation omitted). See also United States v. Hyde, 448 F.2d 815 (5th Cir. 1971), cert. denied, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972); United States v. Tropiano, 418 F.2d 1069 (2nd Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970). When the total evidence is observed in the light most favorable to the government, as it must be on appeal, United States v. Warner, 428 F.2d 730, 736 (8th Cir.), cert. denied, 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 191 (1970), it is clear that the prosecution proved the commission of a federal crime and that the trial court properly submitted this issue to the jury.

■ 2) Appellants claim that the court erred in permitting a fatal variance between the indictment and the evidence. The indictment, Count Two, charged that the defendants "did conspire . . . to obstruct, delay, and affect commerce and the movement of goods or commodities in commerce, to wit: fruit and produce, by means of extortion, that is to obtain the property of one JOSEPH WOZNIAK with his consent by the unlawful use of fear generated by threats made to the health and

physical well being of his family and the economic well being of the Colonial Fruit Market No. 2 of which Wozniak was part owner." Appellants contend that the trial court erred in admitting evidence concerning markets other than Colonial No. 2 and, in so doing, allowed appellants to be convicted of a crime not charged in the indictment. This argument is not well taken. The indictment charges the appellants with interfering with the movement of "fruit and produce," not with the interference of a particular branch of a business. Wozniak testified that Colonial No. 2 was operated as an expansion of the original fruit and produce business and this is amply supported by the entire record. Therefore, we find there was not such a variance in proof as to affect the substantial rights of the accused. See United States v. Schrenzel, 462 F.2d 765, 769 (8th Cir.), cert. denied, 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972). Stirone v. United States, *supra*, upon which defendants rely, is inapposite. In that case, William Rider owned a concrete plant and was about to build a steel plant. There was a contract for the concrete plant to supply concrete for the steel plant. The indictment charged that the interstate commerce affected was the movement of sand for the use in the concrete plant. The trial court had allowed evidence showing the effect upon the interstate transportation of steel. The Supreme Court reversed the conviction finding that the indictment could not be read as charging interference with the movement of steel. Thus, *Stirone* dealt with two separate businesses while the instant case involves one business dealing in the same goods and commodities. We find there was no fatal variance between the indictment and the evidence.

3) Jencks Act (18 U.S.C. § 3500). Appellants contend that their rights under the Jencks Act were violated because the government failed to record the grand jury testimony of F.B.I. agent Jones, that the court allowed government witness Mercurio to testify despite the unavailability of her grand jury testimony and the court denied appellants' request for the report of an interview with a co-employee of government witness Mercurio. The evidence clearly shows that not all the grand jury testimony was recorded. After the F.B.I. agent Jones testified during trial, appellants requested production of his grand jury testimony and, when the prosecutor announced that his testimony had not been recorded, appellants moved to strike his trial testimony which was denied. The United States in its brief concedes that it would be "better practice" to record all grand jury testimony, and although the Second Circuit (United States v. Cianchetti, 315 F.2d 584, 591 (1963)) and the Ninth Circuit (United States v. Thoresen, 428 F.2d 654 (1970)) might agree, nevertheless, there is no constitutional or statutory requirement that grand jury testimony be recorded and we are unaware of any precedent in this Circuit to invoke a ruling making the recording or transcribing of grand jury testimony mandatory. In this instance, we see no reason to depart from our previous rulings on this subject. See United States v. Schrenzel, *supra*; United States v. Harflinger, 436 F.2d 928 (8th Cir. 1970), cert. denied, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971).

Mrs. Mercurio testified before the grand jury and at trial as to the interstate commerce aspects of the produce market. Her testimony before the grand jury was recorded but, by the time of the trial, the stenographer was no longer employed by the government. Consequently, the government was unable to produce a transcript of her grand jury testimony upon request, although it claims to have made diligent efforts to do so. After the trial, the stenographer and notes were located and the transcript was made a part of the record. Appellants contend that it was error to refuse to strike her testimony. This assertion raises two questions: Was the grand jury testimony "in the possession" of the government? If so,

what efforts must the government make to produce the transcript? It is not necessary to decide the possession question or the standard to which the government is held, for if error were committed, it was clearly harmless error. The only difference between Mrs. Mercurio's testimony before the grand jury and at trial is that in her grand jury testimony she admits that some of the sales may have involved locally grown produce. Appellants claim that they were harmed because they were not allowed to get into the *intrastate* aspects of the business. However, that is not important because the statute is only concerned with the *interstate* commerce portion of the business. Furthermore, a great deal of her grand jury testimony dealt with laying a foundation for exhibits evidencing interstate sales, which exhibits the appellants had an opportunity to examine. The following statement by the Supreme Court applies: "Since the same (relevant) information that would have been afforded had the document (transcript) been given to defendant was already in the possession of the defense by way of the witness' admissions while testifying, it would deny reason to entertain the belief that defendant could have been prejudiced by not having had opportunity to inspect the letter (transcript)." Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 1234, 3 L.Ed.2d 1304 (1959).

▆▆▆ On cross-examination of Mrs. Mercurio, it was revealed that another employee of Mercurio Produce, who neither testified at the grand jury or at trial, had been interviewed by the government. Appellants attempted to obtain production of this person's statement and now claim error because the attempt was denied. This contention is clearly without merit. The Jencks Act speaks only in terms of a witness who has testified at trial. Defendants do not have a right under that act to demand such production. See United States v. Pope, 415 F.2d 685 (8th Cir. 1969), cert. denied, 397 U.S. 950, 90 S.Ct. 973, 25 L. Ed.2d 132 (1970). United States v.

Borelli, 336 F.2d 376 (2nd Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), as cited by appellants, does not apply because in that case the government sought to elude the Jencks Act by having a federal agent testify before the grand jury as to what the key witness had told him. Here, the unidentified employee in question had testified neither before the grand jury nor at trial.

▆▆▆ 4) The Orlando statement. After appellant Orlando was taken into custody, he was presented with a form involving his rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which he declined to sign. Further questioning ensued and Orlando stated that he had not been in the Normandy Shopping Center on a particular day. Later Orlando indicated that he did not wish to be questioned further and the interview was terminated. Orlando's exculpatory statement was contradicted by F.B.I. agent Jones who testified that he had seen Orlando at that shopping center on the day in question. The trial judge instructed the jury that if a defendant voluntarily makes a statement tending to show his innocence which is later proved to be false, the jury may consider it as circumstantial evidence tending to show consciousness of guilt. Appellants contend that it was error to admit Orlando's statement since he refused to sign a waiver of his rights. Miranda v. Arizona, *supra*, at page 475, 86 S.Ct. at page 1628 held that: "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination . . ." Determination of whether a defendant knowingly and intelligently waived his rights depends upon the facts and circumstances of each case. Howard v. Swenson, 404 F. 2d 469 (8th Cir. 1968), and this court is fully aware that refusal to sign a waiver is only one factor to be considered. United States v. Ellis, 457 F.2d 1204 (8th Cir. 1972). However, the record in the instant case, in our opinion, clearly

supports the trial judge's conclusion that appellant Orlando knew his rights and voluntarily and intelligently waived his *Miranda* privilege. It is evident from his reading of the form in question, his declination to 'sign the same, and his subsequent refusal to answer further questions that Orlando was well aware of his rights and, notwithstanding, continued to answer questions. This is not to say that the mere fact that a statement was eventually obtained indicates that the accused waived his rights, see Miranda v. Arizona, *supra,* at 475, 86 S. Ct. 1602. However, that he understood the warning and waived his rights is seen from his subsequent statement that he did not wish to answer any more questions and decided to conclude the interview. See Klingler v. United States, 409 F.2d 299 (8th Cir.), cert. denied, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); United States v. Lomprez, 472 F.2d 860 (7th Cir. 1972), cert. denied, 411 U.S. 965, 93 S.Ct. 2144, 36 L. Ed.2d 685 (1973).

■ 5) Appellants contend that the court erred in permitting the government to keep the defendant Accardi from testifying for the appellants herein. We find no merit in this contention. Anthony Accardi was named in the indictment as a co-conspirator and co-defendant. Prior to the appellants' trial, Accardi's motion for severance was sustained. Appellants contend that Accardi would have given testimony beneficial to the defense and that the only purpose for the government's naming him as a co-defendant was to insure that Accardi would take the Fifth Amendment, thus denying them the opportunity of presenting evidence favorable to their defense. In support thereof, defendants show: (1) the indictment against Accardi was dismissed after the trial of the defendants; (2) a letter from Accardi's counsel stating that he would advise Accardi not to testify in defendants' trial.

There is nothing in the record to show whether Accardi would have taken his attorney's advice and declined to testify or if he would have testified, what his testimony would be. This court will not speculate as to whether Accardi would have testified or what might have happened had he taken the stand. See Barba-Reyes v. United States, 387 F.2d 91 (9th Cir. 1967).

■ 6) Appellants next assert that the court erred in receiving hearsay evidence of F.B.I. agent Jones as to statements made by Wozniak and, further, that the court erred in permitting Wozniak to testify as to telephone calls allegedly received from appellant Biondo without adequate foundation that the voice was that of Biondo. We do not agree. F.B.I. agent Jones was allowed to testify as to what Wozniak had told him concerning his (Wozniak's) fears. Appellants first contend that this constituted hearsay and should not have been admitted and, second, that if the testimony was admitted to prove the state of mind, the testimony should have been excluded because there was other evidence as to Wozniak's state of mind and this evidence was prejudicial to appellants. The victim's state of mind is an essential element of the crime charged. Nick v. United States, 122 F.2d 660, 671 (8th Cir.), cert. denied, 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550 (1941); United States v. Hyde, *supra*. The testimony in question was admitted as evidence of Wozniak's state of mind, not for the truth of Wozniak's statements, and the hearsay rule has no application. 6 Wigmore on Evidence (3d Ed.) Section 1766. Furthermore, the trial judge specifically instructed the jury after the testimony was given that they were not to consider the testimony for the truth of Mr. Wozniak's statement. In light of this instruction there was no prejudice to appellants. See United States v. Stirone, 311 F.2d 277 (3rd Cir. 1962), on remand from 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed. 2d 252 (1960), cert. denied, 372 U.S. 935, 83 S.Ct. 881, 9 L.Ed.2d 766 (1963).

■ On direct examination, Mr. Wozniak testified about two phone calls allegedly from Biondo, which threatened

him and arranged a meeting for the payoff. Defendants claim that there was no sufficient foundation for the introduction of the evidence. A telephone conversation is admissible provided that the identity of the speaker is satisfactorily established. New York Life Ins. Co. v. Silverstein, 53 F.2d 986 (8th Cir. 1931). In determining whether a sufficient foundation has been established, the trial judge should consider whether the proof is such that the jury, acting as reasonable men, could find its authorship as claimed. United States v. Alper, 449 F.2d 1223 (3rd Cir. 1971), cert. denied, 405 U.S. 988, 92 S.Ct. 1248, 31 L. Ed.2d 453 (1972). Wozniak testified that he had two earlier conversations with Biondo and he stated at least twice that he could recognize Biondo's voice and that Biondo had a manner of speaking "so different from anybody else's in the world that I ever heard, and for that reason I would swear by my testimony that it was his (Biondo's) voice." Furthermore, identity may be proved by circumstantial evidence, Cwach v. United States, 212 F.2d 520 (8th Cir. 1954). Biondo's May 20th presence at the meeting place and at the time arranged by the caller would certainly constitute circumstantial evidence as to the identity of the caller. Despite Wozniak's admission that he had a hearing defect and that one of the phone calls was long distance, the evidence in this case clearly authorized the trial court's submitting this issue to the jury.

7) Appellants also contend that the court erred in refusing to declare a mistrial when the prosecuting attorney commented in closing argument on failure of the appellants to testify. We disagree and find there was no prejudicial error resulting to the appellants in the court's denying their motion for mistrial. The prosecuting attorney in his closing statement argued as follows:

· "Now, let's go to May 25th, which is four days after Orlando and Biondo were arrested. The FBI has an interview with Joe Boy Scalise. Now, Joe Boy was very quick to say that he left

the conversation with Willie Orlando and Joe Wozniak on May 18th and went shopping. This is four days after they were arrested for extortion. Very quick to inject that. Now, unless he were involved in the extortionate scheme why would he try to disassociate himself with a conversation that occurred on May 18th?

"Now, it's up to you folks to determine whether Mr. Wozniak, his testimony from that witness stand, is the truth. He's the only participant in that May 18th meeting that's testified here. Now, you wonder why . . ."

At this point the defense objected on the grounds that the only other participants at the meeting were Scalise and Orlando and this was an improper comment on their failure to testify. After a short recess the trial court denied a motion for a mistrial and instructed the jury that if they were able to recall the last two statements in the closing statement, they were to disregard them. The court further instructed that "defendants never have any duty of calling any witnesses or producing any evidence." The United States Attorney stated that the interrupted sentence was not going to be a comment on the failure to testify. That, however, does not seem to be the question. The question should be whether the statements on the record, read in context, amounted to a comment on appellants' failure to take the stand and, if so, whether said statements were prejudicial to the defendants. In determining whether the statements were improper comments, the appropriate standard is set forth as follows:

"The facts and circumstances of each case must be carefully analyzed to determine 'whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" (citations omitted) United States v. Mahanna, 461 F.2d 1110, 1114–1115 (8th Cir. 1972).

Even if the court construes the statement to have had any relationship with appellants' failure to testify, the indirectness of the comment when combined with the specific instruction to the jury renders it harmless error. See United States v. Mahanna, *supra*.

We have carefully and painstakenly examined the entire record of this protracted trial, and all errors raised by appellants. We find that no reversible error has been shown and that appellants have had a fair trial.

Accordingly, the judgments and sentences are affirmed.